Case number 16-2544 United States of America ex rel Carla Crockett v. Complete Fitness Rehabilitation Inc. Oral argument not to exceed 15 minutes per side. Nicholas Vermeul for the appellant. You may proceed. Good morning, your honors. I am so excited to be before this particular panel because all three of your honors have written or participated in some of the most significant False Claims Act cases in this circuit. And with all respect to judges Keith and Rogers, in particular, I am especially excited to be before Judge McKeague because I wrote a special section in my brief directed toward your honor concerning the challenge you issued at the end of your dissent in Prather. I'm not sure why you'd be happy to have me given my position in Prather. Well, I like a good challenge, I think. All right. And your honor said if some cases may warrant relaxing Rule 9b's pleading standard, an exception I'm not convinced we should adopt, the proper case should involve a truly fraudulent scheme. And Heard v. Walgreens, the $25 gift card promotion, was not that case. But, judges, Carla Crockett's is that case. This case seems to be even further away from either knowing or substantial likelihood of a false claim being filed than Prather was. So I'd be interested in how you think this is a better case than Prather. Well, the first question I'd like to address is this whole thing about the relaxed standard. And I do want to talk about why I think that it meets either, whatever you want to call the standard, I do think she has that personal knowledge. She never makes reference to a single bill submitted by anybody on behalf of any particular patient, as far as I can see. I could skip ahead a bit, but there are a couple of things where we, you have to remember, her job description involves completing all billing logs. They talked about the fact that she did the scheduling and the minutes, and they used, if you look at these emails between her and Pam Ulrey, they used the schedule and billing interchangeably. I mean, that was the foundation of the billing. And we also have personal knowledge, if you look at paragraphs 128, 129 of our complaint, there's the spreadsheet that we also put in there that Judge Edmonds admitted was a fair recitation of the record, where we talk about specific patients. For example, we look at 128, where Ms. Ulrey says, I am adjusting patient J's rug level. I mean, that's a frank admission of upcoding, and it is personal knowledge of a scheme. It's interesting, because defense counsel used the analogy in their- But where is the evidence even on that one that it's fraudulent? All this assumes that because your client thought a certain level of care was appropriate, and apparently the people in Petoskey thought there should be a higher level of services, that therefore there's some sort of fraud going on. When you are 68 miles away, and you haven't seen the patient, and that decision is left to the interdisciplinary team that's actually assessing the patient upon admission, and they decide, I'm going to assign this patient a medium rug level, and Ms. Ulrey says, no, you are not supposed to do that. You have to assign her a higher rug level on admission, because we have to consider revenue. That's the essence of Medicare fraud. We're not talking about free hot dogs and gift cards. It's only fraud, I would think, if the record doesn't justify the higher level. What I understood them to be saying, so please correct this, is that the home office said, we want to start everybody on the highest level of care to see if we can fix whatever the problem is and get them off the roll. Is that a fair statement? That's their argument, but- So your client didn't like that, wanted to start with a lower level of care, which arguably would then take longer, right? Their argument is, we want to start them high and then see what happens. So why, even though that does enhance revenue, and that seems logical to me too, why is that fraudulent? That's not what the treaters, who are actually seeing the patient, believe is medically necessary. And besides that, paragraph 29 and the smoking gun email that I call it, she doesn't say, I'm doing this on admission. She's saying, I'm taking all the patients, she says, I'm taking all the patients who are on Medicare Part A right now, and I'm moving them all back to the highest drug level. And that's not on admission. Those are the people who are on existing caseload. She says, I'm going to do this. Now, so when we talk about this so-called relaxed standard, I think that that's actually a bit of a misnomer. And I agree that it's a little bit misleading to suggest that Rule 9b has more than one standard. There is one. When you're pleading fraud, a party must state with particularity the circumstances, but not the evidence. And Judge Keith wrote that in 1988, in that Michaels case that's cited, the rule does not mandate the presentation of facts and evidence in a complaint. So we pled those in this case. We pled the numerous communications from Pam Alray. We pled the scheme, I want you to up-code patients. And she basically said, I want you to do it. And when Carla Crockett resisted, she said, I did it, with regard to at least patient J in paragraph 128. I put patient J on ultra-high. And then she said, I will do it. And I will keep doing it, and I will adjust the planner to reflect ultra-high levels on all Med A's currently on caseload. This is no longer negotiable. I hate to interrupt your flow here, but I don't know where to insert my question. There's all this focus about 28 days and 30 days. That's all related to the fact that these people only get nursing home coverage or whatever it is for 30 days. Then they go off it, right? It's not like they're all expected to get better within the 30 days, or am I misunderstanding? My understanding of the scheme is they go out of the hospital, they go to some other facility, and they need physical therapy. They either need a high level or a low level for the first 30 days. After the 30 days, they no longer get Medicare coverage. Is that right? I believe that that is the case, Your Honor. So they either then aren't covered, or they get coverage from somewhere else, or their relatives pay for it. Right. So if a facility wants to maximize the money they get from these people, they've got to do it during those 30 days. I think you're right, Your Honor. And from an occupational therapist standpoint, from Ms. Crockett's standpoint, there's a lot of patients, elderly. They're not getting enough physical therapy not to need it anymore within 30 days for the most part. But more physical therapy can be harmful to a patient whose elderly can't tolerate it. I understand that. Well, the flip side of it is you're not going to keep doing therapy if there's not some therapeutic reason to be doing it. So you're going to try it, you're going to try to make them better, and if you can't make them better, the government is going to keep paying for what didn't have any positive impact. Is that a correct statement? I believe so, Your Honor. So the dispute here was the home office wanted to start them out higher, and she wanted to start them out lower. So you say because starting them out higher would generate higher revenues, therefore that was fraudulent. Well, she didn't want to. She wanted to do whatever the interdisciplinary team did on admission, which is where all the treaters get together. Which was lower. Which was lower. Sometimes it was high. And she said this in her e-mail. Sometimes these patients are correctly assessed at the high level. But it's not... The home office isn't complaining about that. They're only complaining about the difference of opinion between high and low, right? I think what disturbed her, too, is that the emphasis was always on revenue and it wasn't on patient care. So if I... So does the fact that the emphasis is on revenue and not on patient care, does simply saying that, assuming it's true, does that ergo mean fraud and have you pled it with particularity? That's what we're trying to figure out. Well, there's two answers to that, Your Honor. And one is that we've attached some of the articles in our amended complaint that are in the record to talk about how upcoding essentially is the essence of Medicare fraud. And it would basically be... And there were also some instances where she said that you adjusted minutes. We FaceTimed with a patient. We didn't actually spend those minutes. And so upcoding is not just something where we can infer in a light most favorable to the defendants that this is just okay, that we're starting them out and then you're doing it. Because when Carla Crockett and her team tried to reduce it later, Pam already resisted and said, I want you to put them back on that high level because we have to consider revenue. And here's what we get into. I do want to talk a little bit about the pleading standard because I think the broader question is really what this case is about. It's not a new standard, this relaxed standard. And it didn't originate with Prather. Judge Keith's opinion and Michael's recognizes that there are different ways to plead fraud, depending on the circumstances. And that might be a better way to put it. But we go back 60 years. The U.S. Supreme Court said in Conley v. Gibson that a complaint shouldn't be dismissed unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim to entitle him to relief. You have to look at Rule 8. In Conley v. Gibson, it's almost like a concession that your argument is weak. That may be so, but let's look at how the cases have gone on to interpret that, too. You can't look at Rule 9b in isolation. Rule 8 has to be considered. All the cases say you look at Rule 8 with 9b, which is that it's short and plain statement. And sometimes, and this is the main point, that the particulars of the fraud are within the sole control of the defendant. And that is certainly if somebody is fraudulently billing the government, it might be done in secret. So we allow fraud claims to nonetheless go forward if the information is only within the opposing party's knowledge. Michael's recognizes that. Michael cites Wright v. Miller's Federal Practice Treatise, which was written in 1969. In quoting from that treatise, it says that- Aren't you really just trying to re-argue Prather here? I beg your pardon? Aren't you trying to re-argue Prather? We're stuck with Prather for good or bad in terms of your case here. I don't think I'm trying to show how Prather fits within that there's different ways to plead fraud. I think that's my point. We call it a relaxed standard, but that standard is a 50-year-old concept, at least, that just says that sometimes only the defendant has the knowledge. And what I have to do is give you- and Chesbrough gives you another way of- I think you're missing the point, so tell me why I'm wrong here. Yes, you are. Pre-Prather, you had to identify a specific false claim in the Sixth Circuit. And Prather said, well, you don't always have to identify a specific false claim. You have to put in enough to rise to the requisites, quote, strong inference that a fraudulent claim was submitted, end quote. And the basis for that in Prather is the woman was working basically in the billing department. So even though she didn't send the bill out, she was working in the billing department and trying to get all the bills out. So now you have somebody that's nowhere near the billing department. She's preparing something that gets submitted to a department. She's not in the department. She doesn't know what actually was billed one way or the other. Well, her job description, again, says that you prepare all billing logs. That's what she did. That's what those were called, the schedules and the minutes. And I'm not- Let me just- Yes, sir. I mean, it may be true that she prepares the billing logs that get shipped to Petoskey and they bill them out without change. That might be true. But she doesn't even allege that. She just says, I prepared something at some part of the process, the beginning, and I don't think it was right. So therefore, it's a false claim. And I don't see how that survives any test, even Prather, which is the one that helps you the most, potentially. In this field, there are many, many scholarly articles written that this very act of upcoding is the essence of Medicare fraud because you're not giving therapy- We don't follow scholarly articles. We follow our case law, for better or for worse. Prather's a published opinion. We've got to follow it. I hear what the court is saying, but it's like we have to respect in every profession what fraud is. The analogy in law is billing, billing our clients. For example, I as a senior partner- Counsel, I think we understand your argument and you've done it eloquently, and now your time is up and I haven't heard anything about retaliation where it seems like all the pleading precedents kind of move in your favor instead of against you. I can't. It's been an active panel. I haven't gotten to the retaliation yet. It is true that all those doctrines about pleading fraud and all of that, all of that just doesn't apply when you're talking about the retaliation claim. Is that correct? The retaliation claim- Switch back to Iqbal. Your Honor is suggesting it basically bootstraps back to the same thing because she's not alleging fraud. If this scheme isn't fraudulent, then- No, I thought the retaliation claim is not a fraud claim, so you don't have the strict requirements of pleading fraud to plead a retaliation claim. That's correct. 9b doesn't apply to the retaliation claim. You didn't get a chance to elaborate. Whether 9b- Did I address- I'm sorry. Did I address Your Honor's question? I get the sense I didn't. No? Yes. Whether 9b applies or not, the retaliation has to be in connection with something prohibited by the False Claim Act. She might have a retaliation claim under some other statute, but that's not what you're pleading here. You're pleading an FCA claim. So the retaliation has to show- you have to show that she was retaliated because she was opposing fraud, not just opposing something else. So it still comes back to fraud, whether there is a heightened pleading requirement to describe the fraud or not. That's a separate question. I come back to that upcoding is fraud because if you are not seeing a patient and you change what is therapeutically regarded, you're violating the Hippocratic Oath, you're violating the law, you are doing- when Ms. Crockett said in her email, this is maleficence, I had to look up maleficence. That comes from the Hippocratic Oath. It's a violation of the principle you do no harm. Let's cut to the chase. You basically are saying that any time there is a suspicion of upcoding, that gives rise to a False Claims Act claim and a retaliation claim if you end up getting fired along the way, regardless of- and it does not require you to show anything more than the presence of upcoding. That's the essence of your claim, right? If the court believes- Can you answer that yes or no so I can go on to another one? I want to make sure I answer the court's question. Could you please repeat it, Your Honor? You seem to be coming down to the principle that if there is an upcoding, upcoding is the essence of fraud, so all you have to show is upcoding. You don't have to show that the upcoded amount was ever billed or anything. You just have to show upcoding. You've probably said that six times this morning, right? Right. So all I want to know is, have you found any case that says evidence of upcoding is enough? Maybe if you have one, you can show it on repo. That'd be fine. That'd give you a chance to go look. Yeah. Thank you. I didn't- I will look at those cases. Thank you. Thank you very much, Your Honor. Good morning, Your Honor. Skaten Jafilariach on behalf of Complete Rehab. May it please the court. I want to start by- with one very, very important clarification about what I think Prather says. It does not say that plaintiffs are excused from identifying a specific false claim. Prather never says that. There are two things a plaintiff was required to do before Prather. Identify a specific false claim, showing why it was false, and identify the circumstances. Describe the circumstances in which the claim was submitted to the government. That latter requirement is what was relaxed in Prather. Under Prather, if someone is familiar, has personal knowledge of the claim's submission practices, not the sort of logging practices that Ms. Crock is familiar with, but the claim submission practices that Prather was familiar with, then you can rely on a strong inference that the claim was submitted. Would this be another way to look at it? I'm just curious. In Prather, it was somebody that was working in billing. If I remember right, she was hired to take care of a huge backlog of bills and get these bills sent out to the government. So that's what she was doing. This person was not in billing. So it may be true that whatever she sent in got billed. We don't know that one way or the other, but it seems like that's what distinguishes her ability to identify a false claim because she doesn't know what any of the bills actually look like. That, I would say, is a key distinction. So should that be the standard? I mean, that seems to be what Prather says, but should that be the standard? Or should it be relaxed further? Is that the question? No. I mean, I think what your learned colleague is saying is, look, this is a woman that prepared the billing logs, so therefore we assume that's what then became the bill, and therefore we assume that it was sent to the government, and therefore we assume in count two that they paid it and the rehabilitation clinic didn't pay it back. There are at least five inferences that would have to be drawn to get from the planning that she's talking about to the submission of a false claim, which is a sine qua non of a False Claims Act case. Isn't it also true that in almost all these False Claims Act, you have somebody, you have a mole, and you have somebody that you talk to that says, well, I'm in this case in the billing department, and I know all we did is we took these bills and we sent them on. There always has to be identified a specific false claim. It's not just enough to say, you know, I'm familiar with the claim submission process. You do have to still identify a specific false claim that was made. I have to pray that you don't... To bring the fraud claim. I'm sorry? To bring the fraud claim. Yes. Think about it this way. How about to bring the retaliation claim? Do you have to do that for that? You don't have to plead that with particularity, and I do want to spend the majority of my oral argument on that, and so I want to turn to that right after, if I may make one more point. Think about on the particularity requirement for a fraud claim. This is a plaintiff who is coming, wanting to stand in the shoes of the government to assert a fraud claim on behalf of the government. We should be expecting the same particularity from her that you would expect from the government. You would expect the government, if they're going to bring a fraud claim, to know what the content was of the fraudulent statement that was made and to state that in the complaint. We would never accept less than that from the government if they were bringing this claim, and we should not accept less than that from Ms. Crockett. As far as the retaliation goes... What's your authority for saying that we expect a certain thing if it's from the government, so therefore it should be expected from everybody else? Is there a case that says that? I don't have a case that says that, but it makes sense to me that that's why you have these particularity requirements and we should apply them to the same extent. Now the exception to that is Prather. We do all kinds of things that don't make sense. Very small exception. The negative, just to help you segue, the negative inference of that is if you're arguing your own interest in not getting fired for throwing a wrench into the ability of your employer's scheme of getting money from the government that it doesn't deserve, that's a personal interest, right? That's not a claim that the government's going to bring. That's a claim that she's going to bring. Correct. And she does not have to plead that with particularity. And she doesn't have to plead it with particularity. Correct. Eight ball applies here. When you say she doesn't have to plead it with particularity, are you referring to the fact she doesn't have to plead, she doesn't have to identify a specific false claim, or does she not even have to be specific as to what the fraud was? Let me put it another way. Is it true or not that in the retaliation claim she has to be, she has to show or at least plead at some level that she was fired because she was complaining about fraud? Yes. And the fraud is the violation of the Federal False Claims Act, not some other kind of fraud. If she's not complaining about fraud, then it can't be said that the employer fired her because she was complaining about fraud. So she was clearly complaining about a difference of opinion in her medical judgment or whatever she was compared to her boss. That be fair to say? That's what she was doing. She was complaining about professional standards and clinical responsibilities to patients. None of those emails say anything about payments to the government. Every time she says A or B, she's talking about payments to the government though, right? That's what A and B mean. Medicare A and B? There are Medicare A patients and Medicare B patients. Right. If you're talking about Medicare A patients and Medicare B patients, you're talking about patients whose treatment is being paid by the government. Is that true or not? You're obviously going to be talking about those patients in the context of rug levels because that's where the money is coming in. It's designed for. Well, we know she's talking about A and B patients. I don't know why you're hedging on that. It's obvious. The question is, does she say that A and B were being frauded? And I don't mean A and B relating to a person. Does she say in her complaints that she says was the result of her being fired that she was complaining about the bills to patients covered by A and B were being submitted fraudulently? No, and this court already held in MARLAR that when you're talking about an internal report as a cause of the discharge, the internal report itself has to confront the employer about fraud. It has to allege fraud. It has to make a connection in the report between the standard of care they're complaining about and this resulting in fraud. So would it be safe to say the case presents a question of whether complaining about a difference in opinion, the effect of which will increase revenue, whether that's sufficient to be a complaint about fraud? It is. I'm sorry. Is that the question? I'm going to ask you the answer. Isn't that the question that we have to address here? Yes. Well, the question is if she makes a mention of revenue. That's what you're honing in on, Your Honor. Is that right? Don't change the question. The question is doesn't this come down to when she complains about a difference of opinion about what services these people were getting and that to follow what the supervisor says, that will naturally lead to increased revenues. Is that enough to then say that was actually a complaint about fraud? That is not quite the question. Okay. So what is the question then? I don't believe she complained that that was only being done to lead to increased revenues. That's not what she said in the email. The emails are replete with references to we have to be attendant to revenues, we understand revenues are important. There's no secret about that. Right. We're talking about, let's focus on the smoking gun statement that's on page 5 of her reply brief. That's what I'm thinking of at the moment. I thought that was what you were referring to, Your Honor. Just as a clarification, the statutory language doesn't say that her protected activity has to be complaining about fraud. It says efforts to stop violations of this subchapter. Is that a more accurate reading of the statute that applies? I'm quoting it, so you've got to say yes. Yeah, you're reading from it. That's what it says. So every time we've been saying complain about fraud, we should have been saying efforts to stop violations. Which have to be fraud. Right. But you can stop something, you can make an effort to stop something that hasn't happened yet, can't you? In ordinary language. At least at the pleading stage. So the idea there is that if I stop them from providing an improper standard of care, then I am... Stopping them from later submitting fraud applications. If there were enough for retaliation claim, then every time you had a hospital and a dispute about the standard of care, it would give rise to a retaliation claim if the employer was fired after that. I'm not sure that's true. If they're saying that what they're complaining about is the economic motivation for decision making, which they want to stop some practice that's economically motivated rather than care motivated, and then they're fired, that that states a claim. You still have to prove it, or you may get thrown out on summary judgment, but it appears to state a claim under the statute. Because it doesn't say complain about a specific action of fraud. It says efforts to stop violations. Congress amended it to include that. Let me be quiet and let you answer. It can't just be about revenue. It has to be about fraud on the government. And Complete was getting paid by the hour from Boris, not from the government. And so she has to draw a connection in her internal report that she's making between the complaint that she's making and a claim being made or an overpayment being made from the government before she can assert that this is retaliation for trying to stop a false claim being submitted to the government. We know there has to be a false claim for the false claim allegation in count one. But what Judge Rogers is asking you that I don't think you're answering is can the retaliation cause of action almost encompass attempted false claims violations? In other words, stop something before it ever occurs. Sure. Yes, I would absolutely concede that if she sees in the future a false claim is going to be submitted as a result of this and brings that to the attention of the employer and says this is going to result in an overpayment from the government if we go through with this and she gets fired, that's a retaliation claim. Absolutely. But that's not what happens. So you don't have to prove then a specific false claim to come within retaliation. No. But you have to prove or allege that you were attempting to prevent what otherwise would have become fraud. Correct. So the question then becomes is that encompassed in the emails? My answer is no, it's not. Because there's no mention of the government, there's no mention of fraud, there's no mention of a payment from the government. The standard, just to be clear, is plausibility though, right? Under EGPAL? The standard is plausibility. So would it make a difference if in a particular business somebody actually does look at, for example, billing logs and decide which are or are not going to result in bills? Let me interrupt myself to sort of use the law firm example, if that's helpful. It seems to me that you might have an associate in a law firm that is doing work for the government and they're padding their time. But that doesn't mean that ergo there is a false claim being submitted to the government because it goes through a process where presumably the senior partner or somebody is going to look at that and decide whether they actually are or are not going to bill that. So in that case, in my example, it seems to me you'd need a little bit more to show that the padding, one associate complaining about he knew the other associate was padding their hours, rose to the appropriate level. But here we don't know really one way or the other what happens after these billing logs are sent in. If somebody said on information and belief that I know nobody looks at those billing logs, they just pack them up and send them off to the government, that might make a difference than if there is somebody screening these things in the home office to decide what is or is not billable, whether there has or has not been upcoding. Somebody's got to certify these things, right? Yes. I agree with that. There's a very important distinction that the court needs to recognize, and that's that when she's talking about billing, she's not really talking about billing. She's talking about planning. Her smoking gun email that she refers to says, I will be adjusting the planner. Not the billing logs after you've done the work, the planner on what sort of treatment we're going to plan to provide. And so that's why we're five steps removed at that point from ever submitting a false claim to the government. We don't know, as the district court said, we're left wondering what kind of treatment did they actually provide. Did they provide the ultra-high that they were planning to provide, or did they provide the very high? Are you back on the first issue, or are you still talking about retaliation now? Yeah, I guess I did switch back on the first issue. It was something that Judge McKeegan said that made me realize that there's this distinction that gets lost in the discussion. But does that all get washed out simply because we're using the plausibility standard of Iqbal in connection with the retaliation claim? I'm not sure how to answer that because I'm not sure what it means to say that it's washed out, Your Honor. But I would agree that you don't have to show a specific... It means what you have to... The heightened stuff you have to apply for the False Claims Act claim doesn't apply to the False Act Retaliation claim. I would agree. As the court said in McKenzie, all the internal report has to do is sufficiently allege that there's fraud or will be fraud against the government. And that didn't happen here. One last question. If it didn't happen, then that means the False Claims Act is not available to pursue this claim. Doesn't that then mean the Michigan Public Policy claim is available? Because Judge Quist sort of thought it was all or nothing. But the reason the Michigan Public Policy claim isn't available is because there is this other claim that is available. And if it's not really available because you didn't sufficiently allege fraud or whatever it is, then why wouldn't you still be able to go ahead if he wants to exercise supplemental jurisdiction on the public policy claim? Well, he wouldn't have supplemental jurisdiction at that point because there would be no federal claims, for one thing. And secondly... You absolutely have jurisdiction until you decline to exercise it. Now, failing to then return the supplemental jurisdiction claim to the state courts might be an abuse of discretion, but that's something that's not before us. We don't know. I see your point. He's already exercised supplemental jurisdiction. If he had already exercised it... He hasn't exercised it. It's already been invoked. And once it's been invoked, which it was in this case, then until somebody asks him moves that he not pursued, he's got it. And it seems like he declined to exercise supplemental jurisdiction for the wrong reason, if you're right that there isn't a false claims retaliation claim here. I don't think that... I think once you have a retaliation claim under which you can bring your case, a statutory one, the public policy claim falls away. But you're arguing that she can't bring her false claims act retaliation claim here because she doesn't have any evidence of fraud. She's failed to satisfy the pleading standard. And I guess the point is... So once you plead something, even if it's dead wrong, you've then forfeited your Michigan public policy claim? That doesn't sound very likely. I think because there's a statutory false claim retaliation claim available for these sorts of circumstances, you can't bring the public policy. Categorically. It's not a case-by-case basis. Right. That's what I'm saying. There's a scheme here. They haven't met the elements of the scheme. But because there's a scheme, this other scheme just categorically doesn't apply. Right. I'm not adopting that, but I think that's the nature of your answer. Right. It's sort of like preemption law that occupies the field. Got it. Okay. Thank you. I think I found what your honors were looking for. So Medicare will not pay for services that are, quote, not reasonable and necessary for the diagnosis of treatment of illness or injury. That's 42 USC 1395YA1A. And that's pled in our complaint from about paragraph 46 on. You're kind of looking at me, and I, frankly, have forgotten. No, this is a lot of paper in this case. But considering we didn't even get to discovery, it sure is a lot of paper. But that's the basis of when I say upcoding is fraud, that's the basis of it. It has to be reasonable and necessary for the treatment of illness or injury. And, for example, if you are 68 miles away and you're overruling what the treatment team thinks is reasonable and necessary on admission, especially when you have such a short-term admission, then you are violating the law or, at least in good faith, believe that the law is being violated. Let's cut to the chase. You've got a PA and you've got a doctor. The PA thinks the level of treatment is X, and the doctor then says, no, it's going to be Y at a higher level. That's all we know. You would describe that as upcoding because there's a difference of opinion, medical opinion, about the level of services, and they're picking the higher one. So, therefore, you can submit a false claims act claim because you can plausibly allege upcoding. It's a different situation than we have here. Carla was the manager. That's why it's hypothetical. I would have trouble with that one. But you're not even rejecting that one categorically. Well, I would reject it categorically. How about that? Okay, so all upcoding then is not covered by, ipso facto covered by the false claims act. What you want to do here, let's go back to the origin. You're trying to allege that this is something worth looking into. The federal government can only take about 10% of these cases. So the false claims act allows people to be private attorneys general to be able to explore this if you have a good faith claim. And if you are able to allege something and identify a specific patient, which we believe we've done, take the Guillain-Barre Syndrome patient, for example. Guillain-Barre, reasonably and medically necessary, Carla Crockett said, here's why this is wrong for this patient. Is there any allegation in the original or first amended complaint that these examples of upcoding were actually billed to the government? That's why we call it a smoking gun. Because a smoking gun doesn't show you that the gun was fired, right? You don't have a video. Wait a minute, what else is it smoking? We never, we never. I thought that was the whole idea of a smoking gun, is that if the smoke was coming in. Well, I turned the whole concept of plausibility on its head. Before we spin out of control here, could you tell me why you can't answer my question yes or no? It's a very simple one. Is there anything in the amended complaint that says that, we'll call it upcoding for shorthand, was then actually billed? Do you even allege that? No, we allege the strong inference that it was actually billed. And Chesbrough talks about strong inference. And that goes back to the whole, when we talk about that standard. The second circuit just came up with a case, and I do want to bring it to the panel's attention, because it's a very new case. It's called Chorches, C-H-O-R-C-H-E-S. It was July 27th. And I'm going to try to get the court that site.  have looked at the False Claims Act pleading, and it's U.S. X-Rail Chorches, Second Circuit. And I'm sorry, I'm just not putting my hands on that site. Oh, here we go. H-65, F-3rd, 71. They talk about how the 3rd, 5th, 7th, 9th, and 10th, and the D.C. circuits all have permitted pleading where you don't necessarily have to identify false claims specifically. That was submitted to the government, as long as you meet 9B's pleading standards of being able to support a strong inference of a false claim. Do you know off the top of your head where in your complaint you allege that there's a strong inference that these were actually billed? There's so many paragraphs in this complaint that it's a little hard to skim it. Well, in the complaint or in the brief? In the complaint. Okay, so you do say in 175, for example, Ms. Crockett believes that complete rehab either directly submitted or caused a third party to submit a false claim. So that's the kind of language that you say? Yeah. Yes, Your Honor. That's all right. I found it. I found it. I found it. I'm done. Thank you, counsel. We appreciate your argument. The case will be submitted. Thank you.